UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

WILLIAM PARKER, et al.,[1]      )
                                )
            Plaintiffs,         )
                                )
v.                              )         No. 2:18 CV 13 JMB
                                )
CITY OF VANDALIA, MISSOURI,[2] et al.,  )
                                )
            Defendants.         )

**<u>MEMORANDUM AND ORDER</u>**

Presently pending before the Court is Defendants' Motion for Summary Judgment.  (ECF No. 75)  Plaintiffs William Parker ("Parker") and William Jones ("Jones") (collectively "Plaintiffs") filed an opposition (ECF No.87) and Defendants filed a reply thereto.  (ECF No. 97)  The motion is fully briefed and ready for disposition.  All matters are pending before the undersigned United States Magistrate Judge with the consent of the parties, pursuant to 28 U.S.C. § 636(c).  Based upon a review of the file, record and proceedings herein, and for the reasons stated, the Court grants Defendants' motion for summary judgment.

According to the allegations in the Second Amended Complaint ("SAC") (ECF No. 41), Plaintiffs were police officers employed by Defendant City of Vandalia, Missouri ("Vandalia"), a fourth-class city located in Audrain County, Missouri.  (Id. at ¶¶ 4, 22-23)  At the time of the events

---

[1] On January 2, 2019, the Court dismissed with prejudice Plaintiff Raymond Bumbales (ECF No. 49).

[2] Defendants are City of Vandalia, Missouri, Christopher Hammann, Gabriel Jennings, Robert Dunn, John Weiser, Dempsey Dixon, Ralph Kuda, Deborah Hopke, Ramon Barnes, Janet Turner, Teresa Wenzel, Donald Elkins, and W. Alan Winders (collectively "Defendants").

giving rise to the instant action and the filing of the SAC, Chase Waggoner ("Waggoner")[3] was the city administrator of Vandalia and Defendant Christopher Hamman ("Hamman") was the Vandalia Chief of Police.  (Id. at ¶¶ 5-6)  Defendants Gabriel Jennings ("Jennings"), Robert Dunn ("Dunn"), and Dempsey Dixon ("Dixon") were former Vandalia aldermen.  (Id. at ¶¶ 7-8, 10) Defendants John Weiser ("Weiser"), Janet Turner ("Turner"), Teresa Wenzel ("Wenzel"), Ramon Barnes ("Barnes"), and Deborah Hopke ("Hopke") were current Vandalia aldermen.  (Id. at ¶¶ 9, 11-15)  Defendant Ralph Kuda was the mayor of Vandalia.  (Id. at ¶ 17)  Defendant W. Alan Winders ("Winders") served as the interim City Administrator following Waggoner's termination.  (Id. at ¶ 18)  Defendant Donald Elkins ("Elkins") was a Vandalia police officer.  (Id. at ¶ 19)

In the SAC, Plaintiffs assert claims against Vandalia in Count V, against all Defendants except Elkins in Count IV, and against Hammann and Elkins in Counts VI and VII, and Parker asserts a claim against Vandalia in Count I and against all Defendants except Elkins in Count III.[4] Parker alleges a Title VII discrimination claim against Vandalia (Count I) and a discrimination claim against all Defendants except Elkins (Count III), arguing that Defendants  discriminated and retaliated against him based on his national origin, in violation of the Missouri Human Rights Act ("MHRA").  (ECF No. 41, SAC at ¶¶ 132-34)  Plaintiffs allege a § 1983 claim (Count IV) against all Defendants except Elkins, arguing that Defendants violated their liberty interest and constitutional rights by terminating them, failing to protect their good names, and denying them due process by depriving Plaintiffs a meaningful opportunity to be heard at their termination hearing.  (Id. at ¶¶ 139-44)  Plaintiffs allege a § 1983 claim (Count V) against Vandalia.  Plaintiffs also allege a defamation claim (Count VI) and a malicious prosecution claim (Count VII) against

---

[3] On April 15, 2020, Waggoner filed a separate motion for summary judgment (ECF No. 69).

[4] Count II contains a claim by only Bumbales.  (SAC at ¶¶126-29)

2

Hammann and Elkins, arguing that they made false and defamatory statements, and caused them to be maliciously prosecuted.  (Id. at ¶¶ 158-63, 166-73)

I. **Factual Background**

The facts are taken from the SAC, Defendants' Statement of Uncontroverted Material Facts (ECF No. 76), Plaintiffs' Response thereto and Additional Facts in Dispute (ECF No. 86), and Defendants' Reply and Response to Plaintiffs' Statement of Additional Facts.  (ECF No. 98)  To resolve the motion for summary judgment, the Court has considered only those facts that are material and relevant, and the facts are viewed in the light most favorable to Plaintiffs.

Plaintiffs filed a Response to twenty-five of the one hundred forty-three paragraphs of Defendants' Statements of Uncontroverted Material Facts.  See ¶¶ 25, 42, 44-45, 48, 50, 52, 58, 60, 63, 66-72, 82-86, 104, 108, and 141.  Local Rule 4.01(E)[5] provides with respect to summary judgment motions:

> A memorandum in support of a motion for summary judgment shall have attached a statement of uncontroverted material facts, set forth in a separately numbered paragraph for each fact, indicating whether each fact is established by the record, and, if so, the appropriate citations.  Every memorandum in opposition shall include a statement of material facts as to which the party contends a genuine dispute exists.  Those matters in dispute shall be set forth with specific references to portions of the record, where available, upon which the opposing party relies.  The opposing party also shall note for all the disputed facts the paragraph number from movant's listing of facts.  All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party.

---

[5] This local rule "exists to prevent a district court form engaging in the proverbial search for a needle in the haystack.  Courts have neither the duty not the time to investigate the record in search of an unidentified genuine issue of material fact to support a claim or a defense." Libel v. Adventure Lands of America, Inc., 482 F.3d 1028, 1032 (8th Cir. 2007) (internal quotation and citation omitted).

E.D. Mo. L.R. 4.01(E) ("Local Rule 4.01(E).  As a result of Plaintiffs' failure to submit responses to ¶¶ 25, 42, 44-45, 48, 50, 52, 58, 60, 63, 66-72, 82-86, 104, 108, and 141, Plaintiffs have not met the requirements of Local Rule 4.01(E), and are deemed to have admitted the facts set forth in those paragraphs.  Turner v. Shinseki, 2010 WL 2555114, at *2 (E.D. Mo. June 22, 2010)(citing Deichmann v. Boeing Co., 36 F.Supp.2d 1166, 1168 (E.D .Mo. 1999), *aff'd* 232 F.3d 907 (8th Cir.  2000)), cert. denied, 531 U.S. 877 (2000).

Plaintiffs have attempted to create a genuine dispute of material facts by supplementing the record with a statement of thirty-six additional facts in dispute (ECF No. 86), most of these facts are controverted by Defendants and unsupported by the record and some are admitted by Defendants.[6]  (ECF No.98)  Specifically, Local Rule 4.01(E) requires that the opposing party cite the paragraph number from the movant's listing of facts for all disputed facts.  E.D. Mo. L.R. 4.01(E).  Plaintiffs have not cited authority for submitting additional facts as opposition to a summary judgment motion nor has this Court's research found any authority.  Neither the Federal Rules of Civil Procedure, not this Court's Local Rules, make any provision for the submission of additional facts by a party opposing a motion for summary judgment.

The Court addresses the parties' arguments regarding Plaintiffs' Statement of Additional Facts and finds that Plaintiffs asserted factual disputes are either not supported by the record cited by Plaintiffs; immaterial and ineffective for purposes of establishing a genuine issue of material

---

[6] Defendants admitted the statement of additional facts set forth in ¶¶ 1, 2 (in part), 4, 12, 13, 14 (in part), 17, 18, 20, 21, 22, 24, 25 (in part), 26, 27, 28, 29, 32, 33, 34, and 35.

fact precluding the entry of summary judgment; and/or rely on exhibits stricken from the record in the July 28, 2020, Order.[7]

The Court, therefore, accepts the following facts as true for purposes of resolving the motion for summary judgment. Plaintiffs were previously employed by Vandalia, a fourth-class city located in Audrain County, Missouri, as part-time police officers with the Vandalia Police Department.[8] ((ECF No. 41, SAC at ¶¶ 4, 42-43) Parker and Jones were at-will employees. (Jones Depo. at 202; Parker Depo. at 18) Jones completed the scheduling for the police department. (Jones Depo. at 22)

Hammann served as the part-time Chief of Police of the Vandalia Police Department from December 15, 2016, to January 16, 2017. (SAC at ¶ 6; Hammann Depo. at 21) Bumbales was employed as a police officer with the Vandalia Police Department, and he applied for the Chief position at the same time as Hammann. (SAC at ¶ 41. Bumbales Depo. at 31) Parker felt that Bumbales should have been hired over Hammann. (Parker Depo. at 207) Bumbales was upset when he was not hired as Chief, and he expressed his unhappiness. (Bumbales Depo. at 71) Parker and Jones discussed Hammann's hiring and agreed that Hammann lacked the experience to be Chief. (Parker Depo. at 35, 37; Jones Depo. at 36)

---

[7] On July 28, 2020, the Court granted Defendants' motion to strike summary judgment exhibits 16, 17, 22, 25, and 26 and ordered the exhibits stricken from the record.

[8] Under Missouri law, fourth-class city police officers are considered at-will employees governed by the appointive officer provision of § 79.240, Mo. Rev. Stat. See Armer v. City of Salem, 861 F.2d 514, 515-16 (8th Cir. 1988) (explaining that "the Missouri courts have consistently interpreted § 79.240 to include police officers as appointee officers…. [and] treated fourth-class city police officers as 'appointive officers' within the meaning of 79.240. ") (citing Amaan v. City of Eureka, 615 S.W.2d 414 (Mo. banc 1981)).

Jennings, Dunn, and Dixon are former Vandalia aldermen.  (SAC at ¶¶ 7, 8, and 10)  Weiser, Turner, Wenzel, Barnes, and Hopke are current Vandalia aldermen.  (Id. at ¶¶ 9, 11, 12, 13, 14, and 15)  Kuda is the Mayor of Vandalia.  (Id. at ¶ 17)  Waggoner is the former Vandalia City Administrator.  (Id. at ¶ 5)  Following Waggoner's termination, Winders served as the interim City Administrator.  (Id. at ¶ 18)  Elkins is a police officer with the Vandalia Police Department.  (Id. at ¶ 19)

Parker is of Polish ancestry and heritage.[9]  Parker testified that Waggoner discriminated against him based on his national origin by making Polish jokes while acting as City Administrator, and no other actions by Waggoner or anyone at Vandalia were taken because of his national origin.  (Parker Depo. at 25, 149)  In the SAC, Parker alleges that Waggoner "regularly told Polish jokes on numerous occasions" in front of Parker and other employees.  (Id. at ¶¶ 24, 25, 47, 58; Parker Depo. at 25)  Parker and Bumbales approached Jones in October or November, 2016, about Waggoner's Polish comments.  (Jones Depo. at 25-26, Parker Depo. at 23, SAC at ¶ 72)[10]  Parker testified that Hammann, Jennings, Dunn, Weiser, Dixon, Turner, Wentzel, Barnes, Hopke, Kuda, and Winders did not discriminate against him based on his national origin.[11]  (Id. at 153-54, 156)

In late December 2016 or early January 2017, Jones told Waggoner and Kuda  that Parker and Bumbales had filed, or planned to file, EEOC claims.  (SAC at ¶ 72; Jones Depo. at 43)  At that same meeting, Jones told Kuda and Waggoner that he would be filing a EEOC claim as well,

---

[9] Jones is not Polish.  (Jones Depo. at 60)

[10] Defendants cite to page 43 of Parker's deposition but did not attach page 43.  The Court finds that pages 25-26 of Parker's deposition support this factual assertion.

[11] Parker also testified that Jennings, Dunn, Weiser, Turner, Wenzel, Barnes, Hopke, Kuda, and Winders did nothing to damage his standing in the community or his professional reputation.  (Parker Depo. at 174, 178)

out of fear of retribution by Vandalia, Kuda, Waggoner, and Hammann.  (SAC at ¶ 72)  Jones did not report Waggoner's alleged Polish comments to Kuda until after he knew that Hammann had been named police chief.  (Jones Depo. at 43-44)  Although Parker was aware that the Vandalia Police Department had a grievance system,[12] he did not file a grievance regarding Waggoner's Polish comments.  (Parker Depo. at 27, 29)  Jones was aware that the Vandalia Police Department had a grievance system and an anti-harassment policy.  (Jones Depo. at 151-52)  Since 2008, until the day he was fired, Jones set the schedule for the Vandalia police department.  (Id. at 22)

In a January 13, 2017, letter of reprimand, the city attorney outlined her investigation of allegations contained in a written complaint by a former employee regarding, in part, the issue of Waggoner joking with a member of the police department regarding his national heritage and making the officer feel offended and harassed by the jokes.  (Defts' Exh. 9 at 6-9)

Bumbales submitted his EEOC complaint to Kuda on January 6, 2017, after the time he learned that Hammann had been hired as the new Chief, not him.  (Bumbales Depo. at 33, 69)

On January 10, 2017, Parker issued Hammann a citation for failing to register his motor vehicle.  (SAC at ¶ 94; Parker Depo. at 53-54)  Before issuing the ticket, Parker discussed issuing the ticket with Bumbales and Jones.  (Parker Depo. at 57-58)

On January 11, 2017, Bumbales issued Hammann a citation for failing to register his motor vehicle.  (Bumbales Depo. at 102; Defts' Exh. 11)  Jones was aware that Bumbales was issuing this ticket to Hammann, and Bumbales and Parker discussed issuing tickets to Hammann.  (Jones Depo. at 51, 56)

---

[12] Vandalia's grievance system is set forth in the Vandalia City Code, Article VII.  (Defts' Exh. 12)

On January 12, 2017, Bumbales issued Waggoner separate tickets for not properly affixing license plates to his vehicle and for failure to remove an abandoned camper on a state road. (Bumbales Depo. at 75, 92-93; Defts' Exh. 11)  Thereafter, Bumbales realized that he should not have issued the second ticket because the camper was not parked on a state road.  (Bumbales Depo. at 94-95)  Prior to writing this ticket, Bumbales discussed the ticket with Jones.  (Id. at 95)

On January 16, 2017, the part-time positions with the Vandalia Police Department held by Parker, Jones, and Bumbales were eliminated.  (SAC at ¶¶ 75-77; Parker Depo. at 68)  Jones admitted that he had heard about the possibility of restructuring of the police department, and based on his conversation with Hammann, Jones had no concerns about the restructuring.  (Jones Depo. at 63)  Parker acknowledged that Jones' position with the police department was eliminated even though Jones did not have any Polish ancestry or heritage.  (Parker Depo. at 70)  Parker testified that he could not speak about whether the decision to eliminate his position had anything to do with his Polish ancestry and heritage because he did not know Waggoner well enough.  (Id.)  Parker admitted that the Vandalia police force needed more full-time police officers and that he could not work as a full-time officer because he had another full-time job.  (Parker Depo. at 46-47)  Jones also acknowledged that he could not work as a full-time Vandalia police officer.  (Jones Depo. at 62)

Waggoner made the decision, not Hammann, to eliminate the part-time police officer positions and move to have more full-time officer positions.  (Waggoner Depo. at 75)  Waggoner's plan was to eliminate all part-time positions in the police department, and although the other part-time officer positions were not terminated at that time because these officers were not scheduled to work, these positions would have been eventually terminated.  (Id. at 98, Hammann Depo. at 24, 54)  Waggoner explained to Parker that the elimination of his position had nothing to do with

his performance, but that the police department wanted more full-time officers.  (Parker Depo. at 66-67)  Waggoner explained to Jones that the elimination of his position was because Vandalia wanted to move away from part-time officer positions.  (Jones Depo. at 61)

Waggoner, as the City Administrator, believed he had the authority over all departments in Vandalia, including the Police Department, subject to the oversight and approval of the City Council.  (Id. at 15-16)  Waggoner also believed that he had the authority to eliminate positions with consultation of Hammann, but Hammann did not have the authority to eliminate positions or terminate employees.  (Waggoner Depo. at 98-99)  Vandalia does not believe that Waggoner had the authority to eliminate positions.  (Defts' Exh. 7)

On January 17, 2017, Bumbales as the Police Chief for the City of Farber, Missouri, issued Hammann tickets for traveling 47 miles per hour in a 45 mile an hour zone and for failure to have proof of insurance.  (Bumbales Depo. at 111-13; Defts' Exh. 13)

On January 20, 2017, the Vandalia Board of Alderman voted to rescind the decision to eliminate the part-time officer positions and placed Parker, Jones, and Bumbales on paid administrative leave, pending an independent investigation into the events surrounding the elimination of their positions.  (Defts' Exh. 8)  The unanimous vote by the Board of Alderman included "Aye" votes by Jennings, Dixon, Weiser, Turner, and Dunn, as well as non-defendant Doug Bontz.  (Id. at 2-3)  Parker and Jones were paid from January to April 12, 2017, while on administrative leave.  (Parker Depo. at 17; Jones Depo. at 74)

Elkins began working as a Vandalia police officer on January 31, 2017, after Parker, Jones, and Bumbales were placed on paid administrative leave.  (Elkins Depo. at 14-15)  Elkins did not know anyone on the Vandalia Police Department, and Hammann asked him to conduct an internal affairs investigation, which involved issues regarding evidence storage and time sheet

irregularities, including allegations that Plaintiffs forged time sheets.  (Hammann Depo. at 65-68, 72)  Elkins opined that, based on his law enforcement experience and Vandalia's pattern and practice as understood by him, officers were to call into the radio to report on and off duty status. (Id. at 32)  Hammann was not involved in Elkins' investigation and did not direct him to look at anyone specifically.  (Id. at 72)  Elkins investigated Parker, Jones, and Bumbales as part of his investigation, but he never interviewed any of the plaintiffs or the former Police Chief Justin Landis ("Landis").[13]  (Elkins Depo. at 17, 28-30)  Elkins' investigation revealed that both Parker and Jones' time sheets, pay stubs, and radio dispatch logs did not match up.  (Id. at 27)  Elkins' investigation also showed that Parker and Jones' work product did not match the hours they claimed to have worked and that Parker had fraudulently claimed 47.25 hours and Jones had fraudulently claimed 474 hours.  (Id. at 41, Defts' Exh. 9)

Parker testified that Hammann's decision to order an investigation into his employment stigmatized his standing in the community, but he agreed that no one has the right not to be investigated in his employment.[14]  (Parker Depo. at 165, 167)  Elkins' investigation revealed that Parker had neglected his duty as an officer by having 116 derelict reports in the system, and he had engaged in conduct unbecoming of an officer by creating a public disturbance outside of a City Council meeting by verbally berating one officer and flipping off another officer.  (Defts' Exh. 9)  Elkins' investigation further revealed that Jones engaged in conduct detrimental to good order and discipline by failing to properly send a rape kit for testing and allowing it to sit in the

---

[13] Landis served as the Vandalia Police Chief during the period when Plaintiffs were alleged to have forged their time sheets.

[14] Parker also testified that having Hammann sitting in his vehicle on a public street outside of his house caused stigma to his standing in the community, but he conceded that he contributed to this alleged stigma by providing statements to the newspaper.  (Parker Depo. at 165-66, 169, 171)

evidence vault for ten years, and he neglected his duty as an officer by completing only 32 reports in a ten-month time period.  (Id. at 4-5)  Elkins' investigation showed no evidence of wrongdoing by Bumbales.  Parker acknowledged that he was not logged into the dispatch radio although he claimed these hours.  (Parker Depo. at 102)  Jones averred that he failed to call into the radio and report himself on and off duty.  (Jones Depo. at 5)  Parker testified that Elkins damaged his standing in the community by sending a probable cause statement to the Montgomery County prosecuting attorney that resulted in the felony charges being filed.  (Parker Depo. at 179)

After the resolution of the independent investigation on March 1, 2017, the Board of Aldermen unanimously voted to remove Parker, Jones, and Bumbales from administrative leave but then all three officers were placed back on administrative leave, pending a second investigation.  (Defts' Exh. 8 at 4)  The Vandalia Board of Alderman also removed Waggoner from his position as City Administrator on March 1, 2017.  (Id. at 4)

Based on the findings of Elkins' investigation, the Board of Alderman, except for Jennings, voted to terminate Parker and Jones' employment on April 12, 2017.  (SAC at ¶¶ 28-29; Defts' Exh. 8 at 4)  The Board terminated Jones and Parker for conduct unbecoming of a Vandalia police officer, conduct detrimental to the good order and discipline of the police department, and neglect of duty as a police officer.  (Defts. Exhs 10-5, 10-8)  Parker and Jones sought and received an informal hearing with Winders.  (SAC at ¶ 83)  During that hearing, Parker and Jones were told the reasons for their terminations.  (Parker Depo. at 83; Jones Depo. at 77)

The Board reinstated Bumbales' employment but Bumbales resigned on April 15, 2017.  (Id.; Bumbales Depo. at 143, 145; Defts' Exh. 10)

On March 20, 2017, Parker filed a Charge of Discrimination against Vandalia with the Missouri Commission on Human Rights ("MCHR"), naming Vandalia as the only respondent and

alleging claims of racial discrimination related to his national origin and retaliation.  (Defts' Exh. 20 at 6)  Parker listed January 16, 2017, as his latest instance of discrimination, and he did not check the box marked "Continuing Action."  (Id.)  The charge also stated that Parker was reprimanded, had hours changed to less desirable hours, was denied a pay raise, and discharged without reason.  (Id.)  On August 23, 2017, the EEOC issued Parker a right-to-sue letter.  (Id. at 4)  On November 7, 2017, the MCHR issued Parker a Notice of Right to Sue.  (Id. at 1)

On August 14, 2017, the Montgomery County prosecuting attorney filed felony charges against Parker and Jones, relating to the falsification of timecards.  (SAC at ¶ 88; Parker Depo. at 90; Jones Depo. at 80; Pltfs' Exhs. 20 and 21)  The criminal complaints involved allegations of forgery between May 19 and October 12, 2016, as to Parker, and between March 17 and November 9, 2016, at to Jones.  (Pltfs' Exhs. 20 and 21)  Parker acknowledged that the ultimate decision of whether to file charges is made by prosecuting attorney.  (Id. at 179-80)  The forgery allegations stemmed from Plaintiffs' time sheets not corresponding with the hours logged into the dispatch system.  (Pltfs' Exhs.13-14, 20-21; Elkins Depo. at 26-33)  These criminal charges[15] were pending for two weeks and then dismissed without prejudice on August 28, 2017.  (Parker Depo. at 193; Jones Depo. at 83-84; Exhs. 14 and 15)  Hammann testified that he did not have any conversations with the prosecuting attorney about either Parker or Jones.  (Hammann Depo. at 73)  Parker testified that he paid $5,000 to a bondsman for his bond, and he did not get back that money.  (Parker Depo. at 242)  Although Jones posted a $50,000 cash bond and his bond money was returned to him, he lost the use and interest of this money while the bond existed.  (Parker Depo. at 85-86)

---

[15] Although Elkins originally submitted probable cause statements for misdemeanor stealing charges, the prosecuting attorney returned the probable cause statements and directed Elkins "to file five counts of forgery on each one. "  (Elkins Depo. at 24)

At the time the felony charges were filed, Parker and Jones both worked for the Missouri Department of Corrections ("MDOC").  After the felony charges were filed, MDOC placed both on paid administrative leave.  (SAC at ¶¶ 112-113; Parker Depo. at 105, Jones Depo. at 89)  Before this administrative leave, Parker had been suspended five times during his employment at MDOC. (Parker Depo. at 109-10)  Although no one ever told Parker that he was passed over for promotions at MDOC because of the filing of the felony charges, Parker claims, based on his subjective belief, that he was passed over for promotions because of the filing of the felony charges.  (Id. at 107-08) In January 2017, Parker accepted a voluntary demotion with MDOC and admitted this demotion had nothing to with the anything related to this lawsuit.  (Id. at 112-13)  When Parker resigned from his MDOC job, he indicated that he was leaving "to take advantage of a once-in-a- lifetime opportunity."  (Id. at 114)

Jones also claims that the filing of the felony charges contributed to him not receiving a promotion for a warden position at MDOC.  (Jones Depo. at 90-92)  Before being promoted to deputy warden at MDOC, Jones had been suspended for a few months as well as a one-day suspension in September 2018.  (Id. at 94-95)  MDOC terminated Jones a couple of months after the September suspension, and he acknowledged that no one at MDOC told him his termination had anything to do with the filing of criminal charges.  (Id. at 98, 100)  An October 15, 2018, termination letter attributed Jones' termination to being lax in filling vacancies in supervisory positions and addressing deficiencies under his control.  (Id. at 100; Exh. 16)  Jones is currently employed with the Louisiana, Missouri Police Department, and has been since nine to twelve months after leaving his employment with Vandalia.  (Id. at 107)

Jones alleges that Hammann caused damage to his standing in the community and professional reputation because, as his supervisor, Hammann should have known what was

happening with the investigation that resulted in his arrest and because of conversations Hammann allegedly had with third parties when Jones was not present.  (Id. at 126-27, 129)  Jones alleges that Jennings caused damages to his standing in the community and professional reputation by Jennings personally telling Jones that an investigation was taking place.  (Id. at 133, 135)  As to Dunn, Weiser, Turner, Barnes, and Dixon, Jones alleges that Dunn's voting to suspend and later terminate him caused damage to Jones' standing in the community and personal reputation.[16]  (Id. at 137-39, 141-43)  Jones alleges that Wenzel and Hopke caused damages to his standing in the community and professional reputation by voting to terminate him.  (Id. at 141-42, 143)  Jones alleges that Kuda discussed the ongoing investigation loud enough for others to hear, but Jones cannot identify anyone overhearing Kuda.  (Id. at 147-48)  Jones alleges that Winders caused damage to his standing in the community and professional reputation by not going into enough detail during the meeting explaining why he was terminated and for not looking into Vandalia's internal affairs investigation.  (Id. at 148, 150)

As to Parker's defamation claim against Hammann and Elkins, Parker asserts that his claim rests on the statements made about him during the internal affairs investigation, but he acknowledges that these statements were made within the police department as part of police business.  (Parker Depo. at 183-84)  Parker admitted that he does not know if Hammann or Elkins made any specific statements about him to the Vandalia City Council.  (Id. at 188)  Parker also is not aware any statements Hammann and Elkins made about him to the local sheriff's office, Vandalia's insurance agency, the Missouri Highway Patrol Division of Drug and Crime Control, or to the Montgomery Country Prosecutor, other than statements included in the probable cause

---

[16] As to Dixon, Jones alleged that Dixon shared this information with his wife, but Jones admitted that he was not aware of Dixon's wife sharing this information with anyone else.  (Id. at 139-40)

statement used to file the criminal charges and filed as part of an official law enforcement investigation.  (Id. at 188-92; Exh. 21)

With respect the newspaper articles, Parker provided an interview, information, and several quotes for a January 25, 2017, Vandalia Leader article.  (Parker Depo. at 95, 234-55; Defts' Exh. 17)  Parker and Jones agree that Hammann did not make any statements about them in that article. (Parker Depo. at 96; Jones Depo. at 157; Defts' Exh. 17)

On April 2, 2017, the Hannibal Courier Post published a newspaper article.  (Defts' Exh. 19)  The newspaper article discussed how Hammann claimed retaliation after Bumbales, a former part-time Vandalia policeman and current volunteer Farber Police Department police chief, issued a pair of traffic citations, one for going two miles over the speed limit and the other for failing to produce proof of insurance.  Id.  The article also discussed citations issued to Waggoner[17] for related to an unregistered motor home parked on his property, and that Waggoner and Hammann felt "targeted for retaliation because of the police department staffing positions."  Id.

On August 25, 2017, the St. Louis Post Dispatch published an article concerning Plaintiffs' felony prosecutions in Montgomery County.  (Parker Depo. at 99-100; Defts' Exh. 18)  The article does not contain any statements from either Hammann or Elkins.  (Parker Depo. at 100-01; Defts' Exh. 18)

---

[17] In the SAC, Plaintiffs allege that Parker issued Hammann a citation for failing to register his motor vehicle.  (ECF No. 94)  In January 2017, Bumbales placed a 48-hour warning on an improperly parked  recreational vehicle, indicating that the owner had 48 hours to move the vehicle or be ticketed.  (Id. at ¶ 96)  "The recreational vehicle actually belonged to Defendant Waggoner." (Id. at ¶ 97)   After Waggoner failed to move the recreational vehicle within the 48-hour time period, Bumbales attempted to have the vehicle towed but the tow truck driver could not obtain the keys to move the recreational vehicle.  (Id. at ¶¶ 98-100)  Bumbales then issued Waggoner a citation for the improperly parked and inoperable recreational vehicle.  (Id. at ¶ 104)

As to Jones' defamation claim, although Jones alleges that Hammann made comments to newspapers, he was unable to identify any specific comments during his deposition.  (Jones Depo. at 152, 155)  Other than his statements contained in the probable cause statement submitted to a prosecutor, Jones was unaware of any allegedly defamatory statements Elkins made about him. (Id. at159-60; Exh. 22)  Jones acknowledged that Elkins' statements contained in the probable cause statement were made in the scope of his law enforcement work.  (Id. at 160)

II.    **Motion for Summary Judgment and Responsive Briefs Thereto**

In support of their motion for summary judgment (ECF No.75), Defendants contend that the undisputed material facts establish the following conclusions:

Count I - Vandalia - Parker failed to exhaust his administrative remedies as to any portion of his claim occurring after March 23, 2017, and he failed to state a claim of hostile work environment and retaliation against Vandalia;

Count III – Vandalia, Hammann, Jennings, Dunn, Weiser, Dixon, Kuda, Hopke, Barnes, Turner, Wenzel, and Winders – Parker failed to exhaust his administrative remedies as to any portion  of his claim occurring after March 23, 2017, he failed to state a claim of hostile work environment and retaliation, and he failed to show any individual liability;

Count IV - Plaintiffs failed to state a prima facie case of a stigma-plus claim or a claim for due process violations because Plaintiffs were at-will employees, and Hammann, Jennings, Dunn, Weiser, Dixon, Kuda, Hopke, Barnes, Turner, Wenzel, Winders, and Elkins are entitled to qualified immunity;

Count V - Vandalia is entitled to summary judgment on Plaintiffs' Monell municipal liability claim because there is no underlying constitutional violation inasmuch as Vandalia had a policy and Plaintiffs cannot show a pattern and practice;

Count VI – the alleged defamatory statements made by Elkins and Hammann were made in the course of a police investigation and therefore privileged; and

Count VII - Hammann and Elkins are entitled to summary judgment on Plaintiffs' malicious prosecution claim because there was no action terminated in their favor.

In opposition (ECF No. 87), although Plaintiffs rely on many of their additional facts that have been controverted by Defendants, the Court may ignore the controverted facts when ruling on the summary judgment motion.  Parker argues that he exhausted his administrative remedies against Vandalia as to his termination and has supported hostile work environment claim.  Parker also argues that he exhausted his administrative remedies against Defendants.  Both Plaintiffs argue that Defendants violated their due process rights because Defendants failed to a provide a name-clearing hearing after their termination and the reasons for their dismissals, and Defendants are not entitled to qualified immunity.  Next, Plaintiffs contend that they have proven a defamation claim against Hammann and Elkins based on the false probable cause statements regarding their time sheets published to the prosecuting attorney.  Lastly, Plaintiffs argue that they have established a malicious prosecution claim by Hammann and Elkins.

In Reply (ECF No. 97), Defendants largely reiterate the arguments and positions outlined in their motion.

## III.    <u>Summary Judgment Standard</u>

Rule 56 of the Federal Rules of Civil Procedure provides that a court may grant summary judgment if all of the information before the court shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  <u>See</u> <u>Celotex Corp. V. Catrett</u>, 477 U.S. 317, 322 (1986).  The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of

[the record] ... which it believes demonstrate the absence of a genuine issue of material fact."

Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  A party asserting that a fact cannot be genuinely

disputed must support the assertion by "materials in the record, including depositions, documents,

electronically stored information, affidavits or declarations, stipulations (including those made for

purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ.

P. 56(c)(1)(A).  Material facts are those "that might affect the outcome of the suit under the

governing law," and a genuine material fact is one "such that a reasonable jury could return a

verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In response, the nonmovant "must do more than simply show that there is some

metaphysical doubt as to the material facts," and must come forward with "specific facts showing

that there is genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.

574, 586-87 (1986).  In order to survive a motion for summary judgment, "the nonmoving

party must substantiate his allegations with sufficient probative evidence [that] would

permit a finding in his favor based on more than mere speculation, conjecture, or fantasy."

Barber v. C1Truck Driver Training, LLC, 656 F.3d 782, 801 (8th Cir. 2011). Therefore, "if

a nonmoving party who has the burden of persuasion at trial does not  present sufficient evidence as

to any element of the cause of action, then summary judgment is appropriate."  Anderson, 477 U.S.

at 256.

In considering motions for summary judgment, courts view the facts in the light most

favorable to the nonmoving party.  Torgerson, 643 F.3d at 1042 (quotations and internal citations

omitted).  But that requirement applies "only if there is a genuine dispute as to those facts."  Id.

"A mere scintilla of evidence is insufficient to defeat summary judgment and if a nonmoving party

who has the burden of persuasion at trial does not present sufficient evidence as to any element of the cause of action, then summary judgment is appropriate." Pederson v. Bio-Medical App. of Minn. 775 F.3d 1049, 1053 (8th Cir. 2015) (quoting Brunsting v. Lutsen Mountains Corp., 601 F.3d 813, 820 (8th Cir. 2010)).  Further, if the nonmoving party has  failed to "make a showing sufficient to establish the existence of an element essential to that  party's case, ... there can be 'no genuine issue as to any material fact,' since a complete failure of  proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322-23.

## IV. **Discussion**

### A. **The Title VII Claim (Count I) – Vandalia**

#### 1. **Exhaustion**

Parker argues that his failure to file a new Charge of Discrimination relating to his termination should be disregarded because he was first terminated on January 17, 2017.  Although Parker is correct that his job was eliminated, on January 17, 2017, that decision was rescinded by the Board of Alderman, and he was placed on paid administrative leave pending an independent investigation into the events surrounding the elimination of his position.  On April 12, 2017, the Board of Alderman, except for Jennings, voted to terminate Parker and Jones' employment.

On March 23, 2017, Parker filed a Charge of Discrimination against Vandalia with the MCHR, naming Vandalia as the only respondent and alleging claims of racial discrimination related to his national origin and retaliation.  Parker lists January 16, 2017, as his latest instance of discrimination, and he did not check the box marked "Continuing Action."  The charge also stated

that Parker was reprimanded, his hours changed to less desirable hours, he was denied a pay raise, and was discharged without reason.

A plaintiff seeking relief under Title VII must exhaust his remedies before bringing suit in federal court by, in part, timely filing an administrative charge with the EEOC or a state or local agency with the authority to seek relief.  42 U.S.C. § 2000e-5(e)(1).  The text of the statute on exhaustion provides:

> A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter.

Id.

"A termination is a discrete act, not a continuing violation."  Huston v. Wells Dairy, Inc., (8th Cir. 2009).  Discrete acts such as termination, failure to promote, denial of transfer, or refusal hire are each an incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice.  Id. The "termination occurs – and thus triggers the start of the limitations period – on the day it happens."  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002).  The termination "day is when the employer notifies the employee of the decision to terminate [his or] her employment."  Id. (citations omitted).  "Each discrete act is a different unlawful employment practice for which a separate charge is required." Richter v. Advance Auto Parts, Inc., 686 F.3d 847, 851 (8th Cir. 2012) (per curiam); Morgan, 536 U.S. at 1113-14 (a discrete act of discrimination constitutes a separate actionable employment practice, and each discrete act starts a new clock for filing charges based upon it).

Here, Parker filed his EEOC charge on March 23, 2017, against Vandalia.  After Parker filed his charge, the Board of Alderman voted to terminate his employment, effective April 12,

2017, for conduct unbecoming of a Vandalia police officer, conduct detrimental to the good order and discipline of the police department, and neglect of duty as a police officer based on the findings of Elkins' investigation.  The record shows that Parker never filed a new charge related to his April 12, 2107, termination.  See Morgan, 536 U.S. at 114 (plaintiff required to file a new EEOC charge for any discrete discriminatory or retaliatory act after the date of the original charge)  On August 23, 2017, the EEOC issued Parker a right-to-sue letter, and  on November 7, 2017, the MCHR issued Parker a Notice of Right to Sue.  Accordingly, all federal claims related to any allegations after March 23, 2017, including the April 12, 2017, termination are beyond the scope of the EEOC charge of discrimination.[18]

## 2.  Hostile Work Environment and Retaliation

Parker contends that he was subjected to a hostile work environment and retaliation due his national origin.

Title VII makes it unlawful for employers to discriminate against any individual "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

### A.  Hostile Work Environment

Parker alleges only Waggoner, in his capacity as City Administrator, made Polish jokes in his presence more than ten times during his employment, and he reported Waggoner's comments to Jones, his supervisor.

---

[18] In Morgan, the Court acknowledged an exception to its bar on the consideration of discriminatory actions that occur outside the statutory period, but solely for hostile work environment claims.  Morgan, 536 U.S. at 117.  "A charge alleging a hostile work environment claim … will not be time barred so long as all the acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period."  Id.

"Hostile environment claims are different in kind from discrete acts.  Their very nature involves repeated conduct."  <u>Morgan</u>, 536 U.S. at 115 (citation omitted).  "The 'unlawful employment practice' … cannot be said to occur on any particular day.  It occurs over a series of days or perhaps years and in direct contrast to discrete acts, a single act of harassment may not be actionable on its own."  <u>Id.</u> (citation omitted).  Because "incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim."  <u>Id.</u> at 118.  As a result, to submit a timely charge, "the employee need only file a charge within 180 … days of any act that is part of the hostile work environment."  <u>Id.</u>

"Hostile work environment occurs '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  <u>Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs.</u>, 728 F.3d 800, 805 (8th Cir. 2013) (quoting <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993)).  To prevail on his claim of hostile work environment due to his national origin, Plaintiff must show:  (1) membership in a protected group; (2) the occurrence of unwelcome harassment; (3) a casual nexus between the harassment and their membership in the protected group; (4) that the harassment affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt and effective remedial action.  <u>See</u> <u>Banks v. John Deere & Co.</u>, 829 F.3d 661, 667 (8th Cir. 2016).  If any essential element of this prima facie case is not supported by specific facts sufficient to raise a

genuine issue for trial, the Court must grant summary judgment to Defendants.  Grant v. City of Blytheville, 841 F.3d 767, 773 (8th Cir. 2016).

"The standards for a hostile environment are demanding, and conduct must be extreme and not merely rude or unpleasant to affect the terms and conditions of employment."  Blomker v. Jewell, 831 F.3d 1051, 1056 (8th Cir. 2016).  When evaluating a hostile environment, the court should look at the totality of the circumstances, "whether such conduct was physically threatening or humiliating as opposed to a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance."  Id. at 1057.  "A plaintiff must establish that discriminatory intimidation, ridicule, and insult permeated the workplace."  Wilkie v. Dep't of Health & Human Servs., 638 F.3d 944, 953 (8th Cir. 2011).  "Title VII does not, however, create a cause of action for all unpleasant or abusive behavior in the workplace. "  Hathaway v. Runyon, 132 F.3d 1214, 1221 (8th Cir. 1997).

In sum, the challenged conduct here includes the elimination of his part-time position and comments made by Waggoner regarding Parker's Polish ancestry. "More than a few isolated incidents are required,' and the alleged harassment must be 'so intimidating, offensive, or hostile that it poisoned the work environment.'"  Blomker, 831 F.3d at 1057 (quoting Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 967 (8th Cir. 1999)).  "[M]erely rude or unpleasant" conduct [is] insufficient "to affect the terms and conditions of employment."  Alvarez v. Des Moines Bolt Supply, Inc., 626 F.3d 410, 420 (8th Cir. 2010).

Parker satisfies the first prong as he is of Polish ancestry, and the Court will assume, without deciding, that Parker has established the second prong.  Nonetheless, Parker has not advanced any facts from which the Court can find a basis to establish the third prong – that the harassment resulted from his membership in a protected class.

Waggoner made the decision to eliminate the part-time police officer positions held by Parker, Jones, and Bumbales and move to more full-time officers.  Waggoner explained to Parker that the elimination of his position had nothing to do with his performance but that the police department was moving towards having more full-time officers.  Parker admitted that Vandalia police force needed more full-time police officers, but he could not work full-time for Vandalia because he was already working another full-time job.  Parker testified that he does not know if the decision to eliminate his part-time position has anything to do with his Polish ancestry.  Likewise, Jones' part-time position with the police department was eliminated even though Jones did not have any Polish ancestry or heritage.

Parker offers no evidence to substantiate his claim – he only offers speculation that the part-time officer positions were eliminated on account of his Polish ancestry.  To survive a motion for summary judgment, however, Parker must substantiate his allegations with sufficient probative evidence that would support a finding in his favor "based on more than mere speculation, conjecture, or fantasy."  Clay v. Credit Bureau Enters., Inc., 754 F.3d 535, 539 (8th Cir. 2014) (internal quotation marks and citations omitted).  Because Parker does not support his allegations with any probative evidence to show that the alleged actions were based on his national origin, he has failed to establish a prima facie case of hostile work environment.

Further, Parker's position was not actually eliminated because the Board of Alderman rescinded Waggoner's decision immediately and placed Parker on paid administrative leave pending an investigation.  It is undisputed that Parker was on paid leave from January to April 12, 2017.  Thus, Parker's placement on paid administrative leave did not constitute an adverse employment action.  Singletary v. Mo. Dep't of Corr., 423 F.3d 886, (8th Cir. 2005) (holding that the plaintiff did not suffer an adverse employment action by being placed on administrative leave

pending an investigation).  On the record, therefore, the Court cannot find Parker suffered an adverse employment action, and as a result, his discrimination claim necessarily fails.

As to Waggoner's inappropriate comments and/or jokes, Parker testified that Waggoner made over ten inappropriate comments during his employment, but he did not identify any of the comments with specificity or quote the comments.  In late 2016, Parker and Bumbales approached Jones in October or November 2016,  about Waggoner's Polish comments but Jones waited until late December or early January to report Waggoner's comments to his supervisors.  Once reported, Vandalia reprimanded Waggoner for his comments.  Parker admitted that he did not file a written grievance for Vandalia to address, despite knowing that Vandalia had a grievance policy.

Parker likewise cannot satisfy the fifth prong as the evidence does not show that Vandalia failed to take prompt and effective remedial action once Vandalia became aware of Waggoner's comments.  To determine whether the harassment affected a term, condition, or privilege of a plaintiff's employment, the court must consider the totality of the circumstances, including the severity of the conduct, whether it is physically threatening or humiliating, and whether is unreasonably interferes with the plaintiff's job performance.  Sellers v. Deere & Co., 791 F.3d 938, 945 (8th Cir. 2015).  The Eight Circuit observed that "[t]he Supreme Court has cautioned courts to be alert for workplace behavior that does not rise to the level of actionable harassment." Al-Zubaidy v. TEK Indus., Inc., 406 F.3d 1030, 1038 (8th Cir. 2005).  Here, the complained-of conduct, while inappropriate and sometimes embarrassing for Parker, cannot be said to have affected a term, condition, or privilege of employment.

Furthermore, these incidents do not support a finding that Parker endured severe, persuasive work conditions that a reasonable person would find hostile or abusive because the comments were relatively infrequent.  The Eighth Circuit has required much more severe and

pervasive conduct than that alleged in this case.  Ottman v. City of Independence, 341 F.3d 751, 760 (8th Cir. 2003) (reversing the denial of summary judgment and "conclude[ing] the district court erred in finding a triable issue for the jury" where a coworker made sexist and belittling comments to, about, and around plaintiff "on a weekly, if not daily, basis.").  See, e.g., Bainbridge v. Loffredo Gardens, Inc., 378 F.3d 756, 759 (8th Cir. 2004) (finding racial remarks, made directly to plaintiff, once a month for two years by owner and operators, was insufficient to render the workplace  objectively hostile); Johnson v. Bunny Bread Co., 646 F.2d 1250, 1257 (8th Cir. 1981) ("More than a few isolated incidents of harassment must have occurred.  Racial comments that are merely part of the casual conversation, are accidental, or are sporadic do not trigger Title VII's sanctions.").  See also Delph v. Dr. Pepper Bottling Co. of Paragould, Inc., 130 F.3d 349. 352, 354 (8th Cir. 1997) (upholding hostile work environment claim where the plaintiff had been subjected to "a steady barrage of racial name-calling at the [defendant's] facility"); Ways v. City of Lincoln, 871 F.2d 750, 754-55 (8th Cir. 1989) (upholding a finding of hostile work environment where the plaintiff identified approximately fifty examples of racial harassment).  Accordingly, Vandalia is entitled to summary judgment on Parker's hostile work environment claims.

## B.  Retaliation

Parker also alleges he was retaliated against for reporting Waggoner's anti-Polish comments, including being terminated, being scheduled less hours, and not receiving a pay raise.

Title VII prohibits employers from retaliating against employees from engaging in activity that is protected under Title VII.  42 U.S.C. §§ 2000e-3(a) and 2000e-16(a).  A claim of retaliation pursuant to Title VII is not based upon discrimination, but instead upon "an employer's action to punish an employee who makes a claim of discrimination."  Haas v. Kelly Servs., Inc., 409 F.3d 1030, 1037 (8th Cir. 2005).  Plaintiff "first must demonstrate a prima facie case of retaliation to

survive summary judgment." See Jackson v. UPS, Inc., 643 F.3d 1081, 1088 (8th Cir. 2011).  To meet this burden, Parker must show that: 1) he engaged in a protected activity; 2) Vandalia subsequently took an "adverse employment action" against him; and 3) there was a causal connection between the protected activity and the adverse employment action.  Id.  The anti-retaliation provision "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006).

The Eighth Circuit has held that to be materially adverse, retaliation cannot be trivial; it must produce some "injury of harm" and it has found that commencing performance evaluations, or sending a critical letter that threatened "appropriate disciplinary action," or falsely reporting poor performance, or "lack of mentoring and supervision" were actions that did not establish a prima facie case of retaliation, absent showing of materially adverse consequences to the employee.  Littleton v. Pilot Travel Ctrs., LLC, 568 F.3d 641, 644 (8th Cir. 2009).

If Parker cannot show a causal link between his protected conduct and the adverse employment action, summary judgement is proper.  Erenberg v. Methodist Hosp., 357 F.3d 787, 793 (8th Cir. 2004).  Here, Vandalia argues, and the undisputed evidence shows, that there was no adverse employment action and no casual connection exists between Parker reporting Waggoner's comments and any adverse employment action against him.

"An adverse employment action is defined as tangible changes in working conditions that produces a material employment disadvantage, including but not limited to, termination, cuts in pay or benefits, and changes that affects an employee's future career prospects, as well as circumstances amounting to a constructive discharge." Jackman, 728 F.3d at 804.  "However, minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause

no materially significant disadvantage, do not rise to the level of an adverse employment action."
Id.

First for the reasons already discussed, Parker cannot establish a prima facie case as to his part-time position being eliminated. Likewise, although Parker alleges that Waggoner changed his schedule, the record shows that Jones, not Waggoner, set the schedule for the police officers.

As to his retaliation claim regarding the denial of a pay raise by Waggoner, the only support for this claim is the allegations in the SAC. (ECF No. 41 at P 73) Parker cites no evidence in the record in support of this allegation, and he has not submitted the allegation in a verified complaint. The unsworn and unsupported allegation regarding the denial of a pay raise by Waggoner named in the unverified SAC and as repeated in Parker's response to the summary judgment motion do not constitute competent evidence that can be used to defeat a motion for summary judgment. Stockdall v. TG Investments, Inc., 2015 WL 9489615, *879 (E.D. Mo. Dec. 30, 2015) ("The Court cannot rely on unsworn statements at summary judgment. "); Country Mut. Ins. Co. v. Omicron Capital, LLC, 2015 WL 1894997, at * 7 (E.D. Mo. Apr. 27, 2015) ("A party's unsworn and unsupported allegations do not constitute competent evidence that can be used to defeat a motion for summary judgment. "); Williams v. Donahoe, 2014 WL 6083133, at *3 (E.D. Mo. Nov. 13, 2014) (rejecting the plaintiff's statements because he "did not file a verified complaint, and he has submitted no affidavit or other declaration under penalty of perjury that would support these

statements").   Accordingly, Vandalia is entitled to summary judgment on Parker's retaliation claims.

## B.  **The MHRA Claims (Count III) – all Defendants except Elkins**

### 1.  **Termination**

In Count III, Parker claims that all Defendants, excluding Elkins, committed discriminatory acts that subjected him to a hostile work environment based on his national origin, in violation of the MHRA.

As a general rule, a plaintiff cannot sue a defendant under the MHRA without first exhausting his administrative remedies by filing a discrimination charge with the MCHR against that defendant.  Mo. Rev. Stat. § 213.075(1).  This charge must be filed within 180 days of the allegedly discriminatory act and must state "the name and address of the person alleged to have committed the unlawful discriminatory practice."  Id.

Likewise, it is well-settled that the issuance of a notice of right-to-sue letter by the MCHR is a prerequisite to brining a lawsuit under the MHRA.  See Public Sch. Ret. Sys. Of Sch. Dist. Of Kansas City v. Mo. Comm's on Human Rights, 188 S.W.3d 35 (Mo. Ct. App. 2006).  The MHRA expressly provides that the MCHR must issue a notice of right-to-sue letter to the complainant "indicating his or her right to bring a civil action within ninety days of such notice against the respondent named in the [administrative] complaint."  Mo. Rev. Stat. § 213.111(1).

On March 23, 2017, Parker filed a Charge of Discrimination with the MCHR, alleging claims of racial discrimination related to his national origin and retaliation.  (Exh. C, Parker MCHR documents)  The undisputed record shows that he never filed an amended charge of discrimination after being terminated on April 12, 2017, and he did not indicate a continuing action on his charge. On November 7, 2017, the MCHR issued a Notice of Right to Sue.

.     According to the statute of limitations, only those allegedly unlawful employment acts occurring 180 days prior to filing his March 23, 2017, charge, were subject to administrative exhaustion through the charge.  Tisch v. DST Sys., 368 S.W.3d 245, 255 (Mo. Ct. App. 2012) (applying Morgan to conclude that complaints of demotion, denial of transfer, and failure to promote were all discrete acts of discrimination under MHRA not subject to the continuing violation theory).

For the reasons discussed earlier, Parker has failed to exhaust his administrative remedies with respect to his termination by failing to file another charge relating to his April 12, 2017, termination.  Therefore, Parker can only bring a cause of action for events that occurred 180 days prior to filing his March 23, 2017, charge.

## 2.  Hostile Work Environment

Parker contends that he was subjected to a hostile work environment and retaliation based on his national origin.

The MHRA's prohibition against employment discrimination "includes within its scope … generalized claims of discrimination based on a course of conduct," such as claims based on hostile work environment."  Fuchs v. Dep't of Rev., 447 S.W.3d 727, 731 (Mo. Ct. App. 2014).  "A successful claim of hostile work environment discriminatory harassment requires proof that:  (1) the plaintiff is a member of a group protected by the MHRA; (2) the plaintiff was subjected to unwelcome protected group harassment; (3) the plaintiff's membership in the protected group was a contributing factor in the harassment; (4) a term, condition, or privilege of the plaintiff's employment was affected by the harassment. "  Id. at 732.  The conduct must be sufficiently severe or pervasive, "both as it was subjectively viewed by the plaintiff and as it would be objectively viewed by a reasonable person."  Alhalabi v. Mo. Dep't of Nat. Resources, 300 S.W.3d 518, 527

(Mo. Ct. App. 2009).  In assessing the hostility of an environment, courts look to the totality of the circumstances.  Cooper v. Albacore Holdings, Inc., 204 S.W.3d 238, 245 (Mo. Ct. App. 2006). There is no dispute that Parker has established the first part of his claim.

The undisputed evidence before the Court demonstrates that Parker cannot satisfy the MHRA requirements for several reasons.  Waggoner made the decision to eliminate the part-time police officer positions held by Parker, Jones, and Bumbales and move to have more full-time officer positions.  Waggoner explained to Parker that the elimination of his position had nothing to do with his performance and that the police department wanted more full-time officers.  Parker admitted that Vandalia police force needed more full-time police officers, but he could not work full-time for Vandalia because he was already working another full-time job.  Parker testified that he does not know if the decision to eliminate his part-time position had anything to do with his Polish ancestry.  Likewise, Jones' part-time position with the police department was eliminated even though Jones did not have any Polish ancestry or heritage.  In fact, Parker offers no evidence to substantiate his claim – he only offers speculation that the part-time officer positions were eliminated on account of his Polish ancestry.  Moreover, the Board of Alderman rescinded Waggoner's decision to eliminate the part-time officer positions and placed Parker on paid administrative leave.  Indeed, Parker remained on paid leave even after he filed his charge of discrimination.

Parker's claims against all individual Defendants except Elkins must fail because Missouri cases have only allowed for individual liability under the MHRA when the individuals "directly oversaw or were actively involved in the discriminatory conduct."  Hill v. Ford Motor Co., 277 S.W.3d 659, 669 (Mo. banc 2009); Brady v. Curators of Univ. of Mo., 213 S.W.3d 101, 113 (Mo.

Ct. App. 2006) (individual supervisors allegedly participated in the age discrimination and retaliation); Reed v. McDonald's Corp., 363 S.W.3d 134, 139 (Mo. Ct. App. 2012).

Here, Parker testified that Hammann, Jennings, Dunn, Weiser, Dixon, Turner, Wentzel, Barnes, Hopke, Kuda, and Winders did not discriminate against him based on his national origin. Accordingly, the record is devoid of any factual support of discrimination by any of these individual Defendants.

As to Parker's MHRA retaliation claim, § 213.070 makes it an unlawful discriminatory practice to "retaliate or discriminate in any manner against any other person because such person has opposed any practice prohibited by this chapter." To establish a prima facie case of retaliation under the MHRA, a plaintiff must prove that: (1) he complained of discrimination; (2) the employer took adverse action against him; and (3) a causal relationship existed between the complaint and the adverse action. Cooper, 204 S.W.3d at 245. Further, there must be a showing the complaint of discrimination was a "contributing factor" to the employer's adverse employment action. Templemire v. W & M Welding, Inc., 433 S.W.3d 371, 383 (Mo. banc 2014).

Here, Parker cannot state a prima facie case of retaliation because he cannot show an adverse action taken against him. The record shows that his part-time police officer position was not eliminated because the Board of Alderman rescinded that decision and placed Parker on paid administrative leave. Accordingly, Defendants' motion for summary judgment will be granted as to this claim.

## C.  Section 1983 Claims (Count IV) – all Defendants except Vandalia

### 1.  Due Process

In Count IV, Plaintiffs assert a liberty interest in protecting their good names, and allege

that they were denied procedural due process because Defendants failed to provide a name-clearing hearing.

At the conclusion of the second investigation, Vandalia, through its Board of Alderman, terminated Plaintiffs on April 12, 2017.  Plaintiffs requested a hearing to review their terminations, and during the hearing, Vandalia informed Plaintiffs they were terminated due to falsified timecards and conduct detrimental to the police department.

As explained above, both Plaintiffs were at-will employees of Vandalia, a fourth-class city. ((ECF Nos. 35 at 11 and 76 at ¶¶ 11-12)  As such, Plaintiffs had no property interest in their jobs protected by the due process clause and could be discharged for any reason or no reason at all.  Id.; Cooper v. City of Creve Coeur, 556 S.W.2d. 721, 717 (Mo. Ct. App. 1977).

Title 42 of the United States Code, § 1983 allows an individual to bring suit against persons who, under color of state law, have caused him to be "depriv[ed] of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983.  In order to state a claim pursuant to § 1983, a plaintiff must allege two essential elements:  (1) that a right secured by the Constitution or laws of the United States was violated; and (2) that the alleged violation was committed by a person acting under the color of state law.  West v. Atkins, 487 U.S. 42, 48 (1988).  If a defendant is being sued for acts or omissions that occurred while he was acting as an employee of a state or local government, then that defendant is presumed to be a state actor for § 1983 purposes.  Id. at 49 (stating that  "state employment is generally sufficient to render the defendant a state actor").  "A public employee is deprived of his liberty interest in connection with a discharge only when it occurs under circumstances which impose upon the employee a stigma or other disability foreclosing his freedom to take advantage of other employment opportunities." Green v. St. Louis Housing Auth., 911 F.2d 65, 69 (8th Cir. 1990).

Plaintiffs rely on Vandalia Police Department General Order ("General Order") (ECF No. 86-15) in support of their procedural due process claim.  The General Order provides for dismissal of an officer for any action, "which in the opinion of the chief of Police is serious enough in nature to warrant such action."  (Id. at 2)  That provision provides that, if the officer feels his dismissal has been for unfair reasons, he shall have the right to appeal to the City Administrator who has the final decision.

Here, the Board of Alderman, not the Police Chief, terminated Plaintiffs on April 12, 2017. Accordingly, the provisions in the General Order regarding dismissal do not apply to Plaintiffs' termination.  Plaintiffs' reliance on the General Order in support of their procedural due process claim is without merit.  Furthermore, in support of their assertions, Plaintiffs rely on exhibits stricken by the Court – emails chains between counsel and an affidavit from their attorney.  (ECF No. 101)  Plaintiffs cannot rely on the stricken exhibits to create a genuine issue of material fact precluding summary judgment.

Moreover, Plaintiffs have not identified any acts of the individual Defendants that allegedly deprived them of their due process rights, triggering the need for a name clearing hearing.  Indeed, Plaintiffs have failed to identify any comments made by any Defendant at the time of their termination that would be actionable and would have triggered a name clearing hearing.  Liability under § 1983 requires a causal link to, and direct responsibility for, the alleged deprivation of rights.  Madewall v. Roberts, 909 F.2d 1203, 1208 (8th Cir. 1990); see also Martin v. Sargent, 780 F.2d 1334, 1338 (8th Cir. 1985) (claim not cognizable under § 1983 where plaintiff fails to allege defendant was personally involved in or directly responsible for incidents that injured plaintiff); Boyd v. Knox, 47 F.3d 966, 968 (8th Cir. 1995) (respondent superior theory inapplicable in § 1983 suits).  In their SAC, Plaintiffs indicate that Vandalia and Kuda acted to ratify the actions of the

other Defendants, and that Winders attended the April council meeting resulting in Plaintiffs' terminations.[19]   But Plaintiffs fail to provide specific factual assertions indicating that the Defendants named in Count IV were directly involved in or personally responsible for the alleged violations of their constitutional rights.   Rather, Plaintiffs lump Defendants together, without attributing specific actions to specific Defendants.   Because Plaintiffs fail to identify the action taken by the individual Defendants triggering their right to due process, Defendants are entitled to summary judgment on their liberty interest claim.

### 2. **Stigma-Plus Claim**

Plaintiffs next argue that they have proven their stigma-plus claim because Defendants defamed their reputation in connection with their termination.   Plaintiffs also argue that Defendants are not entitled to qualified immunity.

"An employee's liberty interests are implicated where the employer levels accusations at the employee that are so damaging as to make it difficult or impossible for the employee to escape the stigma of those charges."  Winegar v. Des Moines Indep. Cmty. Sch. Dist.,  20 F.3d 895, 899 (8th Cir. 1994).  "The requisite stigma has generally been found when an employer has accused an employee of dishonesty, immorality, criminality, racism, and the like."  Id.  Reputational harm coupled with "some more tangible interests such as employment," can together be "sufficient to invoke the procedural protection of the Due Process Clause."  Id. at 701.  See, e.g., Owen v. City of Independence, Mo., 560 F.2d 925, 935 (8th Cir. 1977) ("In determining whether a government employer has deprived its employee of a liberty interest in the termination of employment, the crucial issue is whether the government employer, in connection with the termination, of the

---

[19] General responsibility for supervisory responsibilities cannot establish personal involvement. See, e.g., Keeper v. King, 130 F.3d 1309, 1314 (8th Cir. 1997).

government employment, …, makes a charge which might seriously damage the employee's standing and reputation in the community."), vacated and remanded on other grounds, 438 U.S. 902 (1978).  This stigma must be established where the employee is accused of actions involving "dishonesty, immorality, criminality, racism, or the like." Winegar, 20 F.3d at 899.

To state a stigma-plus claim, the plaintiff must allege that: (1) an official made a defamatory statement[20] that resulted in stigma; (2) the defamatory statement occurred during the course of termination the employee; (3) the defamatory statement was made public; and (4) an alteration or extinguishment of a right or legal status.  Brown v. Simmons, 478 F.3d 922, 923 (8th Cir. 2007).

a.   Parker

Parker does not dispute that Jennings, Dunn, Weiser, Turner, Wenzel, Barnes, Hopke, Kuda, and Winders did nothing to damage his standing in the community or his professional reputation, leaving only claims against Hammann and Elkins.  Parker asserts that Hammann and Elkins made allegations that he committed a crime.

Although Parker testified that Hammann's act of ordering an investigation into his employment caused stigma to his standing in the community, he agreed that no one has the right not be investigated.  Parker also claimed that Elkins damaged his standing in the community by sending the probable cause statement to the prosecuting attorney that resulted in felony charges

---

[20] "For a defamatory statement to be actionable under § 1983, it must go beyond alleging conduct by the plaintiff that fails to meet professional standards, and instead must damage [] a person's standing in the community or foreclose[] a person's freedom to take advantage of other employment opportunities."  Crews v. Monarch Fire Prot. Dist., 771 F.3d 1085, 1092 (E.D. Mo. 2014) (internal quotations omitted).  "The stigma must be significant, and it usually involves allegations of dishonesty, immorality, criminality, or racism."  Howard v. Columbia Pub. Sch. Dist., 363 F.3d 797, 802 (8th Cir. 2004).

being filed but Parker agreed that ultimately it is the prosecuting attorney's decision whether to file charges.  On the undisputed record, both of these claims fail to state a stigma-plus claim against Elkins and Hammann.

Here, Parker fails to satisfy the second prong because he cannot show that any of the alleged defamatory statements were made during the course of his termination.  First, any statement made during an ongoing internal affairs investigation was made prior to March 2, 2017.  Second, any statements contained in the probable cause statement were not made during the course of his termination because the probable cause statement is signed on July 22, 2017.  Parker also fails to satisfy the third prong because the undisputed record shows that neither Hammann nor Elkins made any public statements about the internal investigation.  Likewise, Hammann's statement that Parker failed to meet the professional standards of a police officer is not actionable under § 1983.  Raposa v. Meade Sch. Dist. 46-1, 790 F.2d 1349, 1354 (8th Cir. 1986) (finding for a defamatory statement to be actionable under § 1983, the statement must go beyond "alleging conduct [by plaintiff] that fails to meet professional standard").  Accordingly, Parker has failed to establish any defamatory statements made by either Hammann or Elkins that resulted in stigma, a necessary element of his stigma-plus claim.

b.  Jones

Jones alleges that Hammann caused damage to his standing in the community and professional reputation because, as a supervisor, Hammann should have known what was going on with Elkins' investigation that resulted in his arrest as well as conversations Hammann allegedly had with third parties when Jones was not present.  This allegation fails as Jones failed to identify any untrue statement made by Hammann during the course of Jones' termination.  By requesting an internal affairs investigation, Jones cannot meet the standards for a stigma-plus claim

37

because this is not a public or defamatory statement.  Likewise, although Jones testified that he believed Hammann made statements to third parties, such statements were not alleged to have been made during the course of his termination.

As to Elkins, Jones cannot meet the first prong inasmuch as the statements set forth in the probable cause statement were not false as Jones admitted that he did not always call into the radio and report himself on duty while working.  Further, the probable cause statement is dated July 22, 2017, three months after Jones' termination.  Thus, Jones has not satisfied the second prong by showing the statements were made during the course of his termination on April 12, 2107.  Jones also fails to meet the third prong because Elkins did not make the probable cause statement public.

As to Dunn, Weiser, Turner, Wenzel, Barnes, Jennings, and Hopke, Jones's claim is based on their votes as a city council members.  But his claim fails to show that these Defendants made any defamatory statement about Jones, resulting in stigma.  Jones' allegation that Jennings told him about the ongoing investigation does not support his claim because the statement was communicated directly to Jones and not to the public.

With respect to Winders, Jones claims that, during a meeting, Winders failed to tell him why he was terminated, and that Winders failed to look into the underlying internal affairs investigation.  But these facts and circumstances do not involve any public statements by Winders.

Jones' stigma-plus allegations also fall short relative to Kuda.  Jones alleges that Kuda spoke about the investigation loud enough for others to hear.  But Jones admitted that he was not aware of anyone who actually heard Kuda speaking.  In fact, the statement was made during a conversation between Kuda and Jones.

As to Dixon, Jones has failed to show a stigma-plus claim by Dixon voting to suspend and then terminate him and sharing this information with his wife because taking a vote does not

establish Dixon made any defamatory statement about Jones, and Jones cannot show Dixon's statement to his wife was made in the course of his termination.

Further, Jones cannot meet the fourth prong of his stigma-plus claim against any of the named Defendants because he cannot show an alteration or extinguishment of a right or legal status.  Jones testified that he had been working in a law enforcement position for nine to twelve months after his termination.  Likewise, Jones cannot show that his termination from MDOC was related to his termination by Vandalia because when terminated by MDOC, MDOC cited his failure to file vacancies in supervisory positions and to address operation deficiencies under his control.  At most, Jones claim is based on speculation and conjecture, and this ineffective for purposes of establishing a genuine factual dispute.  Barber, 656 F.3d at 801.

### 3.  **Qualified Immunity**

Defendants in their individual capacity also argue that they are entitled to qualified immunity from suit.  "Government officials are entitled to qualified immunity, shielding them from liability, unless the official's conduct violated a clearly established constitutional or statutory right of which a reasonable official would have known." Peterson v. Kopp, 754 F.3d 594, 598 (8th Cir. 2014) (internal quotation marks and citations omitted).  Dismissal on the basis of qualified immunity "is inappropriate unless it appears beyond doubt [that the plaintiff] can prove no set of facts in support of [his] constitutional claims which would entitle [him] to relief." Central Airlines, Inc. v. United States, 138 F.3d 333, 334 (8th Cir. 1998) (internal quotations omitted).

"To overcome the defense of qualified immunity, a plaintiff must show:  (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional right or statutory right; and (2) the right was clearly established at the time of the deprivation." Saylor v. Nebraska, 812 F.3d 637, 643 (8th Cir. 2016) (internal quotation and citation omitted).

As discussed, Plaintiffs have failed to prove the deprivation of a constitutional right. Because Plaintiffs have failed to satisfy the first prong of qualified immunity, summary judgement is granted to all named Defendants on this claim in Count IV.  See Hawkins v. Gage City, 759 F.3d 951, 956 (8th Cir. 2014) (" [t]o deny the officers qualified immunity, [the court] must resolve both questions in [the plaintiff's] favor").

### D.  Section 1983 Claims  (Count V) – only Vandalia

In Count V, Plaintiffs assert a § 1983 claim against Vandalia, arguing that the city did not have a policy in place to report wrongdoings, crimes, or other policy violations.

"Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an official municipal policy; (2) an unofficial custom; or (3) a deliberately indifferent failure to train or supervise." Atkinson v. City of Mountain View, 709 F.3d 1201, 1214 (8th Cir. 2013) (quotations marks and citations omitted).  Municipalities may only be held liable under § 1983 for injuries caused by their agents or employees on a theory of vicarious liability like respondent superior.  City of Canton v. Harris, 489 U.S. 378, 385 (1989). The Eighth Circuit has repeatedly "recognized a general rule that, in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim." McCoy v. City of Monticello, 411 F.3d 920, 922 (8th Cir. 2005).  "Without a constitutional violation by the individual officers, there can be no  1983 or Monell" claim for municipal liability.  Hayek v. City of St. Paul, 488 F.3d 1049, 1055 (8th Cir. 2007).

Here, Plaintiffs have failed to show that any of the individual named defendants violated their constitutional rights, thus Vandalia cannot be held liable "on either an unconstitutional policy or custom theory or on a failure to train or supervisor theory."  McCoy, 411 F.3d 922, 923 (dismissing plaintiff's Monell claims against a municipality where there was no individual § 1983

liability against the officers); see also City of Canton, 489 U.S. at 485 ("[O]ur first inquiry in any

case alleging municipal liability under § 1983 is the question whether there is a direct causal link

between a municipal policy or custom and the alleged constitutional deprivation").   Because

Plaintiffs failed to prove any underlying constitutional violation by the individual defendants,

Vandalia may not be held liable.  Whitney v. City of St. Louis, Mo., 887 F.3d 857, 861 (8th Cir.

2018) ("Absent a constitutional violation by a city employee, there can be no § 1983 or Monell

liability for the City.").

### E.  Defamation Claims (Count VI) – Hammann and Elkins[21]

In Count VI, Plaintiffs claim that Hammann and Elkins knowingly made defamatory

statements, causing a loss of reputation, respect, and professional standing.

Parker asserts that his defamation claim against Elkins is based on the probable cause

statement provided to the Montgomery County prosecuting attorney during the investigation into

Parker's employment with the Vandalia Police Department.  Parker argues that Elkins damaged

---

[21] The sole basis for the Court's jurisdiction over Plaintiffs' remaining state-law claims is 28 U.S.C. § 1367(a), which permits a district court to exercise supplemental jurisdiction over claims that are a part of the same controversy as the claims that fall within the district court's original jurisdiction.  Under 28 U.S.C. § 1367(c)(3), the Court may, in its discretion, decline to exercise supplemental jurisdiction over a claim if "the district court has dismissed all claims  over which it has original jurisdiction. " See Zutz v. Nelson, 660 F.3d 346, 359 (8th Cir. 2011).  In determining whether to exercise supplemental jurisdiction, the Court considers judicial efficiency, convenience, and fairness to litigators.  See Candor Corp. v. City of St. Paul, 912 F.2d 215, 221 (8th Cir. 1990).  "[W]hen federal claims are dismissed before trial, the normal practice is to dismiss pendent  [state law] claims." Stokes v. Lokken, 644 F.2d 779, 785 (8th Cir. 1981), overruled on other grounds by Pinter v. Dahl, 486 U.S. 622, (1988); ACLU v. City of Florissant, 186 F.3d 1095, 1098-99 (8th Cir. 1999) (state law claims are typically "dismissed without prejudice to avoid needless decisions of state law … as a matter of comity.") (internal quotation omitted).  Courts should "exercise judicial restraint and avoid state law issues wherever possible" Thomas v. Dickel, 213 F.3d 1023, 1026 (8th Cir. 2000) (internal quotations omitted), and the relevant factors typically point toward declining to exercise supplemental jurisdiction.  Carnegie-Mellon Univ. v. Cahill, 484 U.S. 343, 350 n.7 (1988).  As a result, this Court could have declined  to exercise supplemental jurisdiction over this state law claim.

his standing in the community by sending the materially false statement made in the course of police business.  Although Jones alleges in the SAC that Hammann made defamatory comments to newspapers, he fails to identify any specific comments in the newspaper attributed to Hammann.[22]  Like Parker, Jones also alleges Elkins made defamatory statements in the probable cause statement.

Under Missouri law, the elements of defamation are (1) publication (2) of a defamatory statement (3) that identifies the plaintiff (4) that is false (5) that is published with the requisite degree of fault, and (6) that damages the plaintiff's reputation.  Overcast v. Billings Mut. Ins., 11 S.W.3d 62, 70 (Mo. 2000).  Communications made in police reports which officers are required to make by law are privileged from claims of defamation.  See Doe v. City of Creve Coeur, 666 F.Supp.2d 988, 1002 (Mo. E.D. 2009),  A showing of actual malice may overcome a qualified privilege.  Id.  To support a finding of actual malice, plaintiff must show that the statements were made "with knowledge that it was false or with reckless disregard of whether it was false or not."  New York Times v. Sullivan, 376 U.S. 254, 280 (1964); Rockwood Bank v. Gaia, 170 F.3d 833, 840 (8th Cir. 1999) (applying Missouri law); Bugg v. Vanhooser Holsen & Eftink, P.C., 152 S.W.3d 373, 377 (Mo. Ct. App.. 2004).

Here, Elkins' statements contained in the probable cause statements are entitled to qualified privilege as these statements were made in the course of police business and thus privileged from

---

[22] Under Missouri law, a plaintiff must set forth specifically in his complaint the words and/or statements which are alleged to be defamatory.  See Nazeri v. Missouri Valley College, 860 S.W.2d 303, 313 (Mo. banc 1993).  Jones has failed to state a claim for defamation under Missouri law because the two newspaper articles upon which he relies do not allude to any defamatory statements Hammann made about him.  The SAC fails to set forth Hammann's allegedly defamatory statements, and Jones could not identify any specific comments during his deposition.  See Missouri Church of Scientology v. Adams, 543 S.W.2d 776 (Mo. banc. 1953) (Missouri law requires "a plaintiff complaining of defamation must specifically set forth in the complaint the words which are alleged to be defamatory.").

any claim of defamation.  The undisputed facts establish that the statements in the probable cause statements were not false.  Plaintiffs merely allege, without any factual support on the record, that the statements contained in the probable cause statement regarding them fraudulently entering timecards while employed by the Vandalia Police Department are materially false.  Indeed, Parker acknowledged that he was not logged into the dispatch radio although he claimed these hours, and Jones averred that he failed to call into the radio and report himself on and off duty.  Plaintiffs both admitted that they failed to call into the radio to report for duty at the start and end of every shift. The additional facts on which Plaintiffs rely are not supported by the deposition testimony they cite so there is no support for the purported facts to establish that the probable cause statements were materially false.

Based on his investigation, Elkins found that Plaintiffs' timecards and radio dispatch logs did not match.  Elkins testified that an exception to reporting in the radio occurs when a police officer is working deep undercover, but Plaintiffs do not assert that they were working undercover. The record before the Court establishes that Elkins had reason to believe the statements contained in the probable cause statements signed by him were true.  Accordingly, Elkins and Hammann are entitled to summary judgment on Plaintiffs' defamation claims.

### F.  <u>Malicious Prosecution (Count VII) – Hamman and Elkins</u>

In Count VII, Plaintiffs assert a malicious prosecution claim against Hammann and Elkins for causing felony charges to be filed against them.

43

On August 14, 2017, the Montgomery County prosecuting attorney filed felony charges[23] against Parker and Jones relating to the falsification of timecards.  The criminal complaints involved allegations of forgery, stemming from Plaintiffs' time sheets.  These criminal charges were pending for two weeks and then dismissed without prejudice on August 28, 2017.

Under Missouri law, "a plaintiff in a malicious prosecution action 'must plead and prove six elements:  (1) the commencement of a prosecution against the plaintiff; (2) instigation by the defendant; (3) termination of the proceeding in favor of the plaintiff; (4) the want of probable cause for the prosecution; (5) [that] the defendant's conduct was actuated by malice[;] and (6) that the plaintiff was damaged."  Cassady v. Dillard Dep't Stores, 167 F.3d 1215, 1219 (8th Cir. 1999) (internal quotation omitted).  "Because malicious prosecution suits countervail the public policy that the law should encourage citizens to aid in the uncovering of wrongdoing the courts require strict compliance with the requisite elements."  Sanders v. Daniel Int'l Corp., 682 S.W.2d 803, 806 (Mo. banc 1984).

To prevail on their claim for malicious prosecution, Plaintiffs must prove the underlying criminal prosecution terminated in their favor.

"For purposed of malicious prosecution, an underlying action is deemed terminated when: (1) a final judgment is entered on the merits; (2) the action is dismissed by the court *with prejudice*; or (3) the action is abandoned."  Doyle v. Crane, 200 S.W.3d 581, 589 (Mo. Ct. App. 2006) (emphasis in original).  When a case is dismissed without prejudice, the dismissal constitutes a termination in favor of the defendant for the purpose of a subsequent malicious prosecution suit by him only when the party who initiated the case manifests an intent to abandon it.  Id.  Such a

---

[23] Although Elkins originally submitted probable cause statements for misdemeanor stealing charges, the prosecuting attorney returned the probable cause statements and directed Elkins "to file five counts of forgery on each one."  (Elkins Depo. at 24)

requirement is "reasonable inasmuch as without such finality, the underlying criminal cases could have been re-filed at any time, provided the statute of limitations as to the criminal cases had not expired." Id. The Missouri Court of Appeals has rejected the suggestion that an affirmative action such as an agreement to dismiss the charges upon payment of costs by the defendants will always be necessary to demonstrate an "intent by the prosecutor to finally abandon the prosecution." Id. at 590. Often, intent must be proved by inference from the surrounding facts. Wallace v. State, 573 S.W.3d 136, 146 (Mo. Ct. App. 2019).

In Shinn v. Bank of Crocker, 803 S.W.3d 621, 627 (Mo. Ct. App. 1990), the appellate found that the prosecutor manifested an intent to abandon the prosecution of the plaintiffs, even though the charges against them were dismissed without prejudice, because the record indicated an agreement whereby the plaintiffs would pay court costs and the prosecutor, in turn, would cease the prosecuting of the case. Id.; see also Helenthal v. Polk, 2010 WL 546905, *1 (E.D. Mo. 2010) (finding that dismissal without prejudice for failure to prosecute reflected an intent to abandon the claim). The court explained that "[a]bsent such an agreement there would have been no inducement for the [plaintiffs] to pay the costs," and it is thus "inferable that the prosecutor specified the initial dismissals were without prejudice so he could refile the charges if the [plaintiffs] reneged." Id. The question whether a prosecutor's dismissal of charges without prejudice is a termination in favor of the defendant is, absent a conflict as to the facts relative to the circumstance of the dismissal, a question of law for the court to decide. Cowan v. Gamble, 247 S.W.2d 779, 780 (Mo. 1952) (per curiam) (citing Restatement of Torts § 673(1)(b)).

Here, there was no final judgment on the merits of the criminal prosecution, and the court did not dismiss the prosecution with prejudice, so the issue is whether the prosecution was abandoned. There have been no actions inferring the prosecutor's intent to abandon the felony

charges against Plaintiffs.  The felony charges were dismissed without prejudice and could have been refiled by the prosecutor showing that the charges have not been abandoned unless barred by the applicable statute of limitations.  Indeed, although Elkins originally submitted probable cause statements for misdemeanor stealing charges, the prosecuting attorney returned the probable cause statements and directed Elkins "to file five counts of forgery on each one."  (Elkins Depo. at 24) The uncontroverted evidence demonstrates that the underlying criminal prosecution did not terminate in Plaintiffs' favor.

Even if there is a showing of abandonment, Plaintiffs' claims would still fail as a matter of law against Hammann.  Plaintiffs offer no evidence in the record showing that Hammann instigated the prosecution of the underlying criminal case against them as Hammann never discussed the charges with the prosecuting attorney.  Elkins signed both of the probable cause statements. Nothing in the record, except Plaintiffs' conjecture, establishes the prosecution of the underlying criminal cases against them by Elkins was without probable cause and malice.  Indeed, both Plaintiffs admitted they did not report into dispatch at the start and end of every shift.

**V.  Conclusion**

Based on the foregoing analysis, the record clearly establishes that there are no genuine disputes as to any material facts.  Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 75) is **GRANTED**.

A separate Judgment in accordance with this Memorandum and Order is entered herewith.

Dated this 18th day of March, 2021.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

46